UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 08-150-DLB

JUDY ATIA                                                              PLAINTIFF

vs.                        MEMORANDUM OPINION AND ORDER

DELTA AIRLINES, INC., ET AL.                          DEFENDANTS

*    *    *    *    *    *    *    *

Plaintiff, Judy Atia, commenced this breach of contract and public accommodation discrimination action after she was removed from a Delta Airlines flight from Cincinnati to Paris, and subsequently arrested by airport police for disorderly conduct. Plaintiff contends that Defendant Delta Airlines, through its employee Defendant Gary Richter, refused to let her fly because she is Israeli, and that Defendants Rob Minter and John Arthur Murray, acting with racial animus, arrested her in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. §§ 344.010 *et seq.*

This matter is currently before the Court on Defendants Delta Airlines, Inc. and Gary Richter's Motion for Summary Judgment, (Doc. #24), and Defendants Rob Minter and John Arthur Murray's Motion for Summary Judgment, (Doc. #27). Both motions have been fully briefed (Docs. #33, 35, 36, 37), and the matter is now ripe for review. For the reasons set forth below, because Plaintiff's breach of contract claim against Defendant Delta Airlines, Inc. falls outside the scope of the Montreal Convention, Defendants Delta Airlines, Inc. and Gary Richter's Motion for Summary Judgment (Doc. #24) is **granted in part** and **denied**

1

**in part**; however, because Plaintiff has failed to state a claim under the Kentucky Civil Rights Act, Defendants Rob Minter and John Arthur Murray's Motion for Summary Judgment (Doc. #27) is **granted**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On Friday, October 20, 2006, Plaintiff Judy Atia was ticketed to fly on Delta Airlines from Los Angeles, California to Tel Aviv, Israel, with stopovers in Cincinnati, Ohio and Paris, France.   (Doc. #25, Ex. A).   Plaintiff's flight from Los Angeles to the Cincinnati/Northern Kentucky International Airport was uneventful.  (Doc. #41, 21:12-16).

Prior to boarding her flight to Paris, Plaintiff was required to show her passport to the Delta gate agent on duty.  (Doc. #38, 21:16-22).  Plaintiff–a dual citizen of the United States and Israel–gave both of her passports to the gate agent.   (Doc. #41, 22:1-9).   After reviewing Plaintiff's documentation, the gate agent informed her that her seat had been changed from a window seat at the rear of the aircraft to a window seat toward the front of the aircraft.  (Doc. #38, 11:13-17; Doc. #41, 22:7-11).   Plaintiff believes that, because she was informed of the seat change after the gate agent saw her Israeli passport, her seat was changed because of her nationality.  (Doc. #41, 22:7-11).   Defendant Gary Richter, the Delta gate supervisor on duty at Plaintiff's gate, contends that her seat was changed automatically due to a new seat configuration on the aircraft.  (Doc. #38, 11:20-12:8).

The parties' accounts of what transpired after Plaintiff was informed of her seat change differ considerably.  Plaintiff contends that, when she questioned why her seat had been changed, Richter became abusive.  In her deposition testimony, Plaintiff described her interaction with Richter as follows:

I said, "Why did you change the seat?"

And he poked his finger in my eyes and he was screaming, "This is what I do."

So I took the pass and I went to the plane. I was just sitting. And he was after me, "Get out, get out."

And I said, "Why?"

And he was just screaming, "Get out."

I said, "Listen, I don't want to miss the flight. I really want to see my mother." And he just went crazy. I said, "I'm not leaving the plane." So he called the security people. I didn't want to refuse the security people, so I asked the security people not to let me miss the plane. And they didn't really care.

From this point, everything just went down. They kicked me out of the plane, they didn't give me the ticket. All Delta group against me. All of them got out of the counter, standing like a group, "We heard about you."

"What did you heard about me? What did I do?" Nobody wanted to help me. They send the police after me, followed me everywhere I go. The police suddenly say something I never really used, and I was ending being in jail for nothing.

(Doc. #41; 22:7-23:2).

In contrast, Richter alleges that Plaintiff became visibly angry after being informed of the seat change, but nevertheless accepted her boarding pass. (Doc. #38, 18-24). Approximately twenty minutes after his interaction with Plaintiff, Richter was called to the aircraft. (Doc. #38, 15:21-24). Before reaching the aircraft, Richter observed Plaintiff sitting in a wheelchair parked in the jetway, (Doc. #38, 15:24-25). He asked Plaintiff why she had not boarded the aircraft; Plaintiff replied that she now wanted an aisle seat. (Doc. #38, 16:6). Before Richter could place a call to see if Plaintiff's request could be accommodated, the head flight attendant onboard the aircraft gestured to Richter to come near, and told him that the Captain of the flight wished to speak with him. (Doc. #38, 16:7-20).

Richter met with the Captain, who informed him that Plaintiff was sitting in the jetway because she had become irate and irrational while attempting to board the aircraft, and had

3

verbally abused the flight attendants.  (Doc. #38, 13:8-13, 16:20-24).  The Captain stated that due to Plaintiff's behavior, she would not be permitted to fly and needed to be removed from the aircraft.  (Doc. #38, 16:23-24).  Richter returned to the jetway to speak to Plaintiff, but she was gone.  (Doc. #38, 16:25-17:2).  The head flight attendant told Richter that Plaintiff had returned to her ticketed seat during the time he spoke with the Captain.  (Doc. #38, 17:2-3).

Richter located Plaintiff onboard the aircraft, and asked her to follow him onto the jetway; Plaintiff refused.  (Doc #38, 17:3-10).  Richter reiterated his request, and Plaintiff again refused to leave the aircraft; soon thereafter, someone onboard the aircraft requested the presence of airport police.  (Doc. #38, 17:12-20).  Once the police arrived, Richter left the aircraft and – due to his impression that his presence was increasing Plaintiff's agitation – called another supervisor on duty to take over and attempt to resolve the situation with Plaintiff.  (Doc. #38, 19:5-12).

Upon being removed from the aircraft by airport police, Plaintiff collapsed on the jetway and continued to sit on the floor, crying, for ten minutes.  (Doc. #41, 30:16-31:1, 64:19-20).  When Plaintiff was finally able to compose herself, she was told that she would be unable to fly with Delta that day, and to collect her luggage.  (Doc. #41, 31:2-4).  Plaintiff retrieved her luggage, and proceeded to the Delta ticketing counter to request she be re-booked on another flight to Paris.  (Doc. #41, 32:18-21).  Her request was refused.  (Doc. #41, 33:14-21).

Defendant Rob Minter, an Officer with the Airport Police Department, came on duty at approximately 9:00 p.m. that evening.  (Doc. #28, Ex. 1).  During roll call, he was advised that earlier that evening airport police had removed a female from a Delta Airlines Flight.

4

*Id.* After roll call, Minter was approached by a Delta employee who reported being verbally abused by a woman yelling profanities. *Id.* The Delta employee directed Minter to Plaintiff, who was standing on the curb outside the baggage claim. (Doc. #40, 16:6-12). Minter observed Plaintiff displaying belligerent behavior, and yelling at anyone in her general vicinity. (Doc. #40, 16:14-24). Minter approached Plaintiff and warned her that if she continued to yell, she would be arrested for disorderly conduct. (Doc. #40, 21:7-11). Thereafter, the Delta employee approached Minter and stated that due to her behavior Plaintiff would be prevented from ever flying again on Delta Airlines, and requested Minter inform Plaintiff that she would have to find another carrier to transport her to her destination. (Doc. #28, Ex. 1). Minter obliged, and advised Plaintiff that as she was no longer allowed to fly on Delta Airlines, she needed to leave the airport for the night and attempt to secure transport with another carrier the next day. *Id.* In addition, Minter told Plaintiff that because she no longer had any official business at the airport, she had ten minutes to leave. (Doc. #40, 21:22-22-7). Plaintiff responded by loudly telling Minter that he could take those ten minutes and "shove it up [his] ass." (Doc. #40, 22:5-7).

Minter called for backup, and placed Plaintiff under arrest for disorderly conduct. (Doc. #40, 22:11-22). Plaintiff was handcuffed, and taken to the Airport Police Department for processing. (Doc. #40, 28:15-21). After processing, Plaintiff was transported to the Boone County Detention Center where she remained for approximately twenty minutes before taking a taxi back to the airport. (Doc. #40, 29:23-30:1; Doc. #41, 41:11-23). Upon her return to the airport, Plaintiff retrieved her luggage from Defendant Murray at the Airport Police Department, and purchased a ticket back to Los Angeles on American Airlines; Plaintiff states the ticket cost between $700 and $900. (Doc. #41, 42:3-5). Plaintiff was

5

later charged with disorderly conduct; however, the charges were dropped when Plaintiff, through her attorney, agreed to attend anger management classes.  (Doc. #28, Ex. 1).

Plaintiff filed the instant action on August 5, 2008.  (Doc. #1).  In her two-count Complaint, Plaintiff alleges that 1) Delta Airlines breached its contractual obligation to transport her to her destination; and 2) Defendants Richter, Minter, and Murray discriminated against her due to her national origin in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. §§ 344.010 *et seq.  Id.*  Plaintiff seeks compensatory and punitive damages in excess of $500,000, attorney's fees, and costs of suit.  *Id.*

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  In deciding a motion for summary judgment, the court must view the evidence, and draw all reasonable inferences, in favor of the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 465 U.S. at 586, it must produce evidence showing that a genuine issue remains, *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment

should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B.    The Montreal Convention

The Montreal Convention,[1] which became effective on November 4, 2003, is the successor of the Warsaw Convention.[2]  The Warsaw Convention was an international treaty, created in the early days of air travel, which sought to protect and nurture the nascent airline industry.  Largely a response to fears of airline carrier bankruptcy, the Warsaw Convention had two primary goals: 1) to "'achieve [international] uniformity of rules governing claims arising from international air transportation,'" *El Al Israel Airlines v. Tseng*, 525 U.S. 155, 169 (1999) (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 552 (1990)); and 2) to limit air carriers' potential liability in the event of an accident.

The Montreal Convention is "an entirely new treaty that unifies and replaces the system of liability which derives from the Warsaw Convention. *Erlich v. American Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004).  The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." Montreal Convention, art. 1(1), and preempts all federal or state-law claims falling within its scope.  Montreal Convention, art. 29 ("In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . .").

---

[1] Convention for the Unification of Certain Rules for International Carriage by Air, opened for signature May 28, 1999, ICAO Doc. 9740 (entered into force Nov. 4, 2003), *reprinted* in S. Treaty Doc. No. 106-45.

[2] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, *reprinted* at 49 U.S.C. § 40105.

The Montreal Convention establishes a presumption of liability against air carriers for three categories of damages arising out of the international carriage of passengers or goods.  Article 17 provides carrier liability for the death or bodily injury of a passenger, or the destruction, loss of, or damage to her baggage provided that the harm "took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, art. 17.  Article 18 provides carrier liability "for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air." Montreal Convention, art. 18.  Finally, Article 19 provides carrier liability "for damage occasioned by delay in the carriage by air of passengers, baggage or cargo."  Montreal Convention, art. 19.  Consideration of these three sections in conjunction with Article 29–which governs preemption under the Convention–compels the conclusion that "for all air transportation to which the Convention applies, if an action for damages, however founded, falls within one of the Convention's three damage provisions, the Convention provides the sole cause of action under which a claimant may seek redress for [her] injuries."  *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp. 2d 361, 365 (S.D.N.Y. 2006).

### 1. Plaintiff's Breach of Contract Claim Is Not Preempted by the Montreal Convention

Defendants Delta Airlines and Gary Richter contend that because Plaintiff's breach of contract claim arises out of events which occurred during the course of embarkation of an international flight, her claim is preempted by the Montreal Convention.  Plaintiff responds that her claim falls outside the scope of the Convention because she alleges non-performance of a contract.

8

Although the Sixth Circuit Court of Appeals has not addressed this issue, a number of other federal courts have concluded that where the complaint alleges complete non-performance of a contract, rather than delay in transportation, the Montreal Convention does not preempt a plaintiff's breach of contract claim. *See, e.g.*, *Nankin v. Continental Airlines, Inc.*, No. CV-09-07851, 2010 WL 342632, at *7 (C.D. Cal. Jan. 29, 2010) (holding that the Montreal Convention was not applicable to plaintiffs' claims because "[b]ased on plaintiffs' allegations, it clearly appears that, through its employees, Continental refused to perform the contract"); *Mullaney v. Delta Airlines, Inc.*, No. 08-cv-7324, 2009 WL 1584899, at *3 (S.D.N.Y. June 3, 2009) (holding plaintiff's breach of contract claim was not preempted by the Montreal Convention because plaintiff was "seeking damages resulting from Delta's refusal to provide him with *any* flight home after having taken his money for a ticket—in short, for failure to perform its obligation to provide carriage in exchange for money it had received"); *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 455 (E.D.N.Y. 2007) (holding plaintiffs' breach of contract claims fell outside the scope of the Montreal Convention because "the plain language of Article 19 of the Montreal Convention indicates that it governs claims for delay, not nonperformance"); *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp. 2d 361, 369 (S.D.N.Y. 2006) (holding plaintiffs' claims were not preempted by the Montreal Convention because they were "grounded in a cause of action for non-performance of a contract and not delay"); *but see Bloom v. Alaska Airlines*, 36 F. App'x 278, 281 (9th Cir. 2002) ("Bloom's pleadings . . . make clear that his contract and fraud actions are indistinct from his claims from emotional distress because all arose from the same discrete event during embarkment.  Therefore, these causes of action are preempted by the Warsaw Convention.").

9

Defendants cite a number of cases where federal courts have found plaintiffs' state-law claims to be preempted by the Montreal or Warsaw Conventions, however, all of the cases cited are distinguishable from the case at bar.  The majority of the cases cited by Defendants in support of their argument that Plaintiff's breach of contract claim is preempted involve individuals seeking damages for physical or emotional damages sustained onboard an aircraft, rather than for a breach of contract.  *See, e.g.*, *Carey v. United Airlines*, 255 F.3d 1044 (9th Cir. 2001) (Plaintiff brought state-law claims of intentional infliction of emotional and mental distress, negligent infliction of emotional and mental distress, and false imprisonment arising out of an incident between him and a flight attendant while flying from Costa Rica to Los Angeles); *Best v. BWIA West Indies Airways Ltd.*, 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008) (Plaintiff sought recovery for alleged physical and mental injuries sustained while being forcibly removed from an aircraft during a stopover on a trip from the United States to Grenada); *Ugaz v. American Airlines, Inc.*, 576 F. Supp. 2d 1354, 1360 (S.D. Fla. 2008) (Plaintiff sought to recover for injuries she sustained when she fell walking up an inoperable escalator shortly after her flight arrived at the airport); *Grimes v. Northwest Airlines, Inc.*, No. 98-CV-4794, 1999 WL 562244, at *1 (E.D. Pa. July 30, 1999) (plaintiff was involved in heated dispute with another passenger while boarding an aircraft and sued to recover damages for physical injuries allegedly suffered while being removed from the aircraft by airport police).  Although the remaining cases cited by Defendants do involve breach of contract claims, they are likewise distinguishable as they do not involve an allegation that the airline breached its duty to transport plaintiff to a specific destination. *Yahya v. Yemenia-Yemen Airways*, No. 08-14789, 2009 WL 2711955, at *1 (E.D. Mich. Aug. 25, 2009) (Plaintiff, as personal

representative of the estate of a passenger who died during an international flight, brought several state-law claims—including breach of warranty—alleging that passenger's death was caused by airline's refusal to land prior to reaching scheduled destination); *Mbaba v. Societe Air France*, 457 F.3d 496, 500 (5th Cir. 2006) (Plaintiff alleged state-law claims, including breach of contract, stemming from alleged excess baggage fees).

Because Delta Airlines flatly refused to transport Plaintiff to her destination after the altercation onboard the aircraft, the facts of this case are most analogous to a decision by the Seventh Circuit Court of Appeals, *Wolgel v. Mexicana Airlines*, 821 F.2d 442 (7th Cir. 1987). The plaintiffs in *Wolgel*, purchasers of round-trip tickets from Chicago to Acapulco, were bumped from their flight, but not offered transportation on a later Mexicana Airlines flight. *Id.* at 442, 445. Noting that the plaintiffs had "never left the airport," the Seventh Circuit construed their claim as sounding in non-performance rather than delay. *Id.* at 445. The court then looked to the drafting history of the Warsaw Convention to determine whether plaintiffs' claims were preempted. *Id.* at 444. Finding that the delegates to the Convention had concluded that "there was no need for a remedy in the Convention for total nonperformance of the contract, because in such a case the injured party has a remedy under the law of his or her home country," and "had agreed that the Convention should not apply to a case of nonperformance of a contract," the Seventh Circuit held that plaintiffs' claim fell outside of the scope of the Convention and was, therefore, not preempted. *Id.* at 444.

In the absence of controlling Sixth Circuit authority, the Court finds the reasoning of *Wolgel* persuasive, and dispositive regarding Plaintiff's breach of contract claim. The plain language of Article 19 of the Montreal Convention indicates that it governs claims for delay,

11

not nonperformance.  Montreal Convention, art. 19 ("The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage, or cargo.").  In addition, the drafting history of Article 19 of the Warsaw Convention – whose pertinent language is identical to its Montreal Convention counterpart– indicates that it was never intended to apply to claims of complete non-performance of a contract.  Therefore, consistent with the majority of federal courts that have addressed this issue, the Court concludes that because Plaintiff's breach of contract claim is based on Delta Airlines' failure to either transport her to her destination or to offer her a refund for the unused portion of her ticket, her breach of contract claim is not preempted by the Montreal Convention.  Accordingly, Defendants' motion for summary judgment on that ground is **denied**.

### 2.    Delta Airlines Is Not Immune From Liability Under the Federal Aviation Act

In addition to arguing that Plaintiff's breach of contract claim is preempted by the Montreal Convention, Defendants further contend that Delta Airlines is immune from liability related to is refusal to transport Plaintiff pursuant to Section 44902(b) of the Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 *et seq.*  Titled "permissive refusal," Section 44902(b) states: "Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."  49 U.S.C. § 44902(b).  The courts, by judicial construction of § 44902(b), have adopted a standard for liability for an airline's permissive refusal to transport decisions.  The standard most frequently employed is that developed by the Second Circuit Court of Appeals in *Williams v. Trans World Airlines*: that liability will not attach to a carrier's decision to refuse air transport unless that decision is shown to be

arbitrary or capricious.  509 F.2d 942, 948 (2d Cir. 1975); *see also Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 14 (1st Cir. 2008); *Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669, 671-72 (9th Cir. 1982); *Al-Tawan v. American Airlines, Inc.*, 570 F. Supp. 2d 925, 930-31 (E.D. Mich. 2008) (adopting the arbitrary and capricious standard employed in *Williams*); *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp. 2d 841, 846 (S.D. Ohio 2003) (same).

Plaintiff contends that Section 44902 cannot shelter Defendants from liability because "[t]here are genuine issues of material fact regarding the alleged legitimate safety concerns which Defendant Delta Airlines must demonstrate to justify a denial of service . . . ."  (Doc. #33 at 6).  Although Plaintiff does not support this assertion with any specific citation to the record, her argument is nevertheless persuasive.  Currently before the Court are conflicting accounts of what occurred onboard the aircraft prior to Plaintiff's removal by airport police.  Plaintiff asserts that she passively accepted her seat reassignment and was sitting, buckled, in her assigned seat when Gary Richter told her to get off the plane, and denies ever speaking to any of the flight attendants onboard the aircraft.  (Doc. #41, 28:5-21).  In contrast, Richter states that he was informed by the Captain of the flight that Plaintiff had been acting irrationally while boarding the aircraft, and had verbally abused the flight attendants.  (Doc. #38, 16:20-24).  However, Richter was not in position to observe Plaintiff's behavior prior to his attempt to remove her, and no party has, to this date, deposed the Captain, flight attendants, passengers, or any other person who may have directly observed Plaintiff's behavior onboard the aircraft.  Therefore, due to the conflicting accounts of the events which precipitated the arrival of the airport police, the Court cannot,

as a matter of law, determine whether Delta Airlines' refusal to transport Plaintiff was "arbitrary and capricious."

### 3. Plaintiff's Discrimination Claim Against Defendant Richter Is Preempted by the Montreal Convention

Although Plaintiff's breach of contract claim falls outside the scope of the Montreal Convention, her discrimination claim against Gary Richter does not.[1]  As discussed above, the Convention's preemptive effect on local law under Articles 17 and 29 extends to all causes of action for injuries to persons or baggage suffered during the course of international airline transportation—regardless of whether a claim could actually be maintained under the provisions of the Convention.  *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 161, 172 (1999) (discussing the Warsaw Convention and concluding that "recovery . . . if not allowed under the Convention, is not available at all"); *King v. American Airlines, Inc.*, 284 F.3d 352, 359 (2d Cir. 2002).

In *Tseng*, the Supreme Court held that although the plain language of Article 17 limits recovery to passengers who have sustained "bodily injury," that article nevertheless preempts any action for passenger injury suffered on board an aircraft or while embarking or disembarking, regardless of whether bodily injury has been alleged.  *Tseng*, 525 U.S. at 161.  The plaintiff in *Tseng* brought suit to recover damages for psychological injuries suffered as a result of an intrusive security search during the embarkation process.  *Id.*

---

[1] Although Defendant Richter is sued in his individual capacity, because Plaintiff does not allege that he was acting outside of the scope of his employment with Delta Airlines when the alleged discrimination occurred, he is entitled to the protection of the Montreal Convention.  Montreal Convention, art. 30(1) ("If an action is brought against a servant or agent of the carrier arising out of damage to which the Convention relates, such servant or agent, if they prove that they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to invoke under the Convention.").

Although plaintiff had no cause of action under the Convention—because she had not suffered any bodily injury—she was nevertheless prohibited from circumventing its restrictions by bringing an action to recover under local law.  *Id.*

In the case at bar, Plaintiff admits that she is suing to recover damages only for emotional injuries suffered as a result Richer's alleged discrimination.  (Doc. #41, 43:9-144:3).  Consequently, although she cannot maintain a cause of action under Article 17, her claim is nonetheless preempted because it arose from events that took place during embarkation of an international flight. *See, e.g.*, *King v. American Airlines, Inc.*, 284 F.3d 352, 355 (2d Cir. 2002) (holding that passengers' discrimination claims, brought under 42 U.S.C. § 1981, fell within the substantive scope of, and were preempted by, the Warsaw Convention because the claims arose from events that occurred during the course of embarkation of an international flight); *Waters v. Port Auth.*, 158 F. Supp. 2d 415, 429 (D.N.J. 2001) ("Although [the] cause of action is grounded in discrimination statutes, the thrust of his claim is one of personal injury.  Undoubtedly, this falls within the scope of the Convention and the goal of providing a uniform scheme of liability."); *Turturro v. Continental Airlines,* 128 F. Supp. 2d 170, 180-81 (S.D.N.Y. 2001) (dismissing discrimination claim brought pursuant to the Air Carrier Access Act, 49 U.S.C. § 41705 *et seq.*, insofar as it was founded on actions that took place on board the aircraft)  Accordingly, Defendant Richter is entitled to summary judgment on Plaintiff's discrimination claim brought under the Kentucky Civil Rights Act.

### C.   Defendants Minter and Murray Are Entitled to Summary Judgment on Plaintiff's Discrimination Claim

Count II of Plaintiff's Complaint alleges that Defendants Minter and Murray "acted

in violation of the Kentucky Civil Rights Act . . . by discriminating against Ms. Atia by virtue of her national origin." (Doc. #1). The Complaint does not contend that Defendants' conduct violated any other statute—federal or state—or any guarantee of the United States Constitution.[2] Unfortunately for Plaintiff, however, the Kentucky Civil Rights Act "does not apply to discrimination that may occur during an interaction between a citizen and a police officer." *Young v. City of Radcliff*, 561 F. Supp. 2d 767, 792 (W.D. Ky. 2008).

The stated purpose of the Kentucky Civil Rights Act is "to safeguard all individuals within the state from discrimination because of race, color, religion, national origin, sex, age forty (40) and over, or because of the person's status as a qualified individual with a disability." Ky. Rev. Stat. § 344.020(1)(b). The Act protects individuals against discrimination in employment, and guarantees that no individual will be denied the equal enjoyment of a place of public accommodation, resort or amusement facility. *See, e.g.*, Ky. Rev. Stat. §§ 344.040, 344.120. By its terms, the Act does not encompass the type of discrimination Plaintiff alleges—arrest without probable cause due to Plaintiff's status as an Israeli national. Consequently, Plaintiff has failed to state a claim for violation of the Kentucky Civil Rights Act. Accordingly, and the Court grants summary judgment in favor of Defendants Minter and Murray.

### III.   CONCLUSION

Because Plaintiff has failed to state a claim under the Kentucky Civil Rights Act, Defendants Minter and Murray are entitled to summary judgment. Likewise, because

---

[2] Even though Plaintiff states, in her Memorandum Contra the Motion for Summary Judgment Filed by Defendants Delta Airlines, Inc. and Gary Richter, that her "second claim is based upon wrongful discrimination in violation of 42 U.S.C. § 1981, based upon her national origin," (Doc. #33 at 6), her Complaint does not contain a count based upon federal law. The Complaint contains only two counts: breach of contract, and a violation of the Kentucky Civil Rights Act.

Defendant Richter is entitled to the protection afforded by the Montreal Convention, he is also entitled to summary judgment on Plaintiff's discrimination claim.

However, because Plaintiff's breach of contract claim falls outside the scope of the Montreal Convention, that claim survives.  Despite the survival of her breach of contract claim, even if Plaintiff is able to demonstrate that Defendant wrongfully breached its contract to transport her to Israel, she is not entitled to recover either punitive damages, Ky. Rev. Stat. § 411.184(4) ("In no case shall punitive damages be awarded for breach of contract."), or damages for any emotional injury resulting from the breach of contract, *Prather v. Providian Nat. Bank*, No. 2006-CA-000630-MR, 2007 WL 1784084, at *3 (Ky. Ct. App. June 8, 2007) ("We have consistently held that parties are not entitled to recover damages for mental anguish or annoyance suffered due to a breach of contract."). Consequently, there emerges a question whether Plaintiff's simple breach of contract claim, standing alone, is sufficient to satisfy the "amount in controversy" necessary for this Court to retain diversity jurisdiction over this matter.

It has long been held that "damages for breach of contract ' are compensation for the loss which naturally results or follows the breach, limited, however, to such losses as the parties might have reasonably contemplated as a probable consequence and which are capable of being estimated with reasonable accuracy.'"  *Young v. Thomas*, No. 2002.CA-01230-MR, at *7 (Ky. Ct. App. 2003) (quoting *Bugg & Franks v. Jones*, 183 Ky. 500, 503-4 (Ky. 1919)).  Moreover, "facts must be shown which afford a basis for measuring or computing damages with reasonable certainty." *Kentucky West Virginia Gas Co. v. Frazier*, 302 Ky. 642, 646 (Ky. 1946); *see Pauline's Chicken Villa, Inc. v. KFC Corp, Ky.*, 701 S.W.2d 399 (Ky. 1985).

17

Based on Plaintiff's deposition testimony, it appears that the damages to which she may be entitled even if she ultimately prevails on her breach of contract claim fall well below the Court's jurisdictional requirement.  However, as no party addressed the issue of damages in their submissions before the Court, further briefing is necessary for the Court to determine whether it can retain subject matter jurisdiction based solely on Plaintiff's breach of contract claim.

Accordingly, **IT IS ORDERED** as follows:

1.    Defendants Delta Airlines, Inc. and Gary Richter's Motion for Summary Judgment (Doc. #24) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.    Summary judgment is hereby **GRANTED** in favor of Defendant Gary Richter as to Count II of the Complaint (Violation of KRS §§ 344.010 *et seq.*);

    b.    Summary judgment is hereby **DENIED** as to Count I of the Complaint (Breach of Contract);

2.    Defendants Rob Minter and John Arthur Murray's Motion for Summary Judgment (Doc. #27) is hereby **GRANTED**;

3.    By **close of business Friday, March 19, 2010**, the remaining parties shall file briefs, not to exceed five pages, addressing whether Plaintiff's breach of contract claim is sufficient to satisfy the Court's amount in controversy requirement for diversity jurisdiction.

This 3rd day of March, 2010.

18



Signed By:

*David L. Bunning*   DB

**United States District Judge**

G:\DATA\Opinions\Covington\2-08-150-MOO.wpd

19